MIDDENDORF, WILLIAMS & CO., Incorporated,

vs.

## ALEXANDER MILBURN COMPANY.

*Bills of Exception—Bill of Particulars—Limitations—Contract
to Sell Stock—Action for Breach—Damages—
Instructions—Evidence.*

That the appellant did not submit the bills of exception to the
appellee's attorneys within the time provided by Laws of 1916,
Ch. 625, amending the Revised Charter of Baltimore City, is
not ground for dismissal of the appeal, if they were signed by
the court before the expiration of the time limited by the stat-
ute, and the appellee does not appear to have suffered any
injury by the delay.                                              p. 594

The amendment of the bill of particulars merely for the pur-
pose of permitting proof of damages of a different character,
but resulting from the same breach and recoverable under the
same form of action, does not let in the plea of limitations, if it
was not available at the time of bringing the suit.          p. 595

In an action for breach of contract, it was proper to instruct
the jury that in case their verdict shall be for plaintiff, they
are at liberty in their sole discretion to allow the plaintiff inter-
est at the rate of six per cent. per annum from the time when
they shall find the damages sustained by plaintiff were in-
curred.                                                         p. 596

In an action for defendant's breach of its contract to under-
take the sale of the preferred stock of plaintiff corporation,
*held* that the latter could not recover as damages costs incurred
by plaintiff in selling some of such stock by consent before the
breach, since such costs could not have been charged to defend-
ant if it had performed its contract.                         p. 596

In an action for breach of contract to sell a block of plain-
tiff's preferred stock, plaintiff having, two years after such

breach, raised the money elsewhere by the sale of convertible notes, *held* that whether plaintiff fully discharged its duty to minimize its loss by making the most advantageous terms possible for the raising of the money, and whether it waited an unreasonable time, or longer than was necessary, were questions for the jury.                                    p. 597 .

The plaintiff was under no duty to show what it would have cost it to secure the money at the exact time of the alleged breach by defendant, it being possible that the money could not have been procured at any price at that time, and there being evidence from which the jury could infer that the cost was no greater at the time the arrangements were finally made than at the time of the breach.                                    p. 597

Conceding that one could refuse to carry out his contract to sell corporate stock, not fraudulent, simply because the stock was not of such high character as an investment that he could recommend it to the class of people who looked to him for advice, the correctness of his opinion adverse to the stock, as a reason for failure to carry out his contract, was for the jury.

p. 597

A prayer offered by defendant, to the effect that plaintiff could not recover if the jury found that defendant could not have sold the stock within a certain period named, *held* properly modified by inserting "a reasonable time" in place of the phrase naming such period.                                    p. 598

It was proper to refuse a prayer that plaintiff could not recover more than nominal damages unless the jury find that at the time of defendant's refusal to sell plaintiff's stock no other responsible broker could have been found by reasonable efforts on plaintiff's part, who would have been able to sell said stock on the same equally advantageous terms, since this would deprive him of the right to exercise any choice, based on personal confidence, in the selection of a broker.                                    p. 598

In an action for breach of defendant's contract to undertake the sale of plaintiff's preferred stock, evidence as to the value of stock of plaintiff which was used in part to pay the expenses of subsequent financing elsewhere *held* admissible.                                    p. 599

Evidence as to the current rate charged by investment brokers *held* admissible on the question of the propriety of the expenses incurred by plaintiff in securing the money elsewhere after the breach by defendant.                                        p. 599

A statement by appellee's counsel, in his argument before the jury, as to the speculative character of defendant's brokerage business, *held* not ground for reversal.                          p. 599

Act 1914, Ch. 149 (Code, Art. 5, Sec. 24A), providing that if a reversible error affects a severable item or a part only of the matters in controversy, the appellate court may direct final judgment as to the remaining parts or items, and may direct a new trial as to the said severable part or item only, authorizes a reversal as to the severable item without a new trial, if in the opinion of the court there could be no recovery on such item.

p. 600

*Decided January 13th, 1921.*

Appeal from the Superior Court of Baltimore City (DUFFY, J.).

The second prayer of appellee (plaintiff) was as follows:

The jury are instructed that in case their verdict shall be for the plaintiff they are at liberty in their sole discretion to allow the plaintiff interest at the rate of six per cent. per annum from the time when they shall find from the evidence the damages sustained by the plaintiff (if the jury shall so find) were incurred.   (*Granted.*)

Among the prayers submitted by appellant (defendant) were the following:

*Seventh Prayer.*—The defendant prays the Court to instruct the jury that there is no evidence in this case legally sufficient to maintain the fifth item of $20.20, the sixth item of $64.92, the seventh item of $177.90, the eighth item of $588 or the ninth item of $125, in the plaintiff's bill of particulars, and that, therefore, even if they find a verdict in favor of the plaintiff they cannot award any damages on ac-

count of such items or include the amounts thereof in any verdict that they may render. (*Refused.*)

*Eighth Prayer.*—The defendant prays the Court to instruct the jury that there is no evidence in this case legally sufficient to maintain the eleventh item in the plaintiff's bill of particulars, amounting to $6,000, and that, therefore, even if they find a verdict in favor of the plaintiff they cannot award any damages on account of such item or include the amount thereof in any verdict that they may render. (*Refused.*)

*Ninth Prayer.*—The defendant prays the court to instruct the jury that there is no evidence in this case legally sufficient to maintain the twelfth item in the plaintiff's bill of particulars amounting to $2,000, and that, therefore, even if they find a verdict in favor of the plaintiff they cannot award any damages on account of such items or include the amount thereof in any verdict that they may render. (*Refused.*)

*Tenth Prayer.*—The defendant prays the Court to instruct the jury that there is no evidence in this case legally sufficient to maintain the sixteenth item of $73.60, the seventeenth item of $75.40, or the eighteenth item of $250, in the bill of particulars filed by the plaintiff, and that, therefore, even if they find a verdict in favor of the plaintiff they cannot award any damages on account of such items or include the amounts thereof in any verdict that they may render. (*Refused.*)

*Eleventh Prayer.*—The defendant prays the court to instruct the jury that there is no evidence in this case legally sufficient to show what it would have cost to secure the money desired by the plaintiff corporation at the time of the alleged breach by the defendant of its alleged contract, and that, therefore, the jury cannot in any event award the plaintiff more than nominal damages. (*Refused.*)

*Twelfth Prayer.*—The defendant prays the court to instruct the jury that if the jury find from the evidence that the defendant, Middendorf, Williams & Company, agreed to

take up the matter of the sale of the plaintiff's preferred stock only upon the condition that Howard P. Page should first investigate, report upon and give a favorable opinion upon said transaction, and if the jury further find that the said Page did not give a favorable opinion upon said transaction but gave an unfavorable one in reference thereto, then the verdict must be in favor of the defendant. (*Granted.*)

*Thirteenth Prayer.*—The defendant prays the court to instruct the jury that even if they find from the evidence that the defendant contracted to offer the plaintiff's preferred stock of sale to the clients or customers of the defendant and subsequently refused so to do, yet if the jury further find that such refusal was due to the fact that at subsequent investigations the defendant on reasonable grounds reached the honest belief that it could not properly and honestly recommend or offer said stock to their clients as a good investment security, then the verdict must be for the defendant. (*Refused.*)

*Fourteenth Prayer.*—The defendant prays the court to instruct the jury that if they find from the evidence that even if the defendant had endeavored to sell the plaintiff's preferred stock *within a reasonable time after July 21st* (during the summer and fall of) *1914,* that the defendant, by reason of market conditions then existing, could not have succeeded in such efforts, then their verdict must be for the defendant. (*Granted as modified.*) Portion in parenthesis is part stricken out by the court, portion in italics is the part inserted by the court.

*Fifteenth Prayer.*—The defendant prays the court to instruct the jury that there is no evidence in this case legally sufficient to show that the defendant, Middendorf, Williams & Company, at the time of the alleged breach of the alleged contract between the parties, could have sold the plaintiff's preferred stock even if they had endeavored so to do and therefore, the jury cannot in any event award the plaintiff more than nominal damages. (*Refused.*)

*Sixteenth Prayer.*—The defendant prays the court to instruct the jury that they cannot award more than nominal damages to the plaintiff in this case unless they find the follyowing facts:

(1) That the defendant would have succeeded in selling said stock had they endeavored so to do.

(2) That at the time of the defendant's refusal to sell said stock no other responsible broker could have been found by reasonable efforts on the part of the plaintiff who would have been able and willing to sell said stock on the same or equally advantageous terms. (*Refused.*)

*Seventeenth Prayer.*—The defendant prays the court to instruct the jury that it appears by the uncontradicted evidence that it was agreed between the plaintiff and defendant at the request of the defendant that Mr. Tinsley of the defendant corporation, was to be given $3,000 par value of common stock in the plaintiff corporation, that therefore, the actual value of this stock was one of the expenses necessarily incident to the so-called Middendorf plan of financing and such value must be deducted from any items the jury may allow in favor of the plaintiff for expenses incurred under any other plan of financing. (*Refused.*)

*Eighteenth Prayer.*—The defendant prays the court to instruct the jury that if they find a verdict for the plaintiff in this case, the difference between the cost to the plaintiff under the plan of the Industrial Corporation and Middendorf plan establishes the correct measure of damages only in the event that the jury shall further find from the evidence in the case that the plaintiff could not, by the exercise of reasonable efforts, raise the money desired in the manner contemplated by the Middendorf plan. (*Refused.*)

*Nineteenth Prayer.*—The defendant prays the court to instruct the jury that there is no evidence in this case legally sufficient to establish the contract set out in the plaintiff's declaration and therefore, under the pleadings in this case the verdict must be for the defendant. (*Refused.*)

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Vernon Cook* and *Enos S. Stockbridge*, for the appellant.

*J. Kemp Bartlett* and *J. Kemp Bartlett, Jr.*, with whom were *Bartlett, Poe & Claggett* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the court.

This is the second appeal in this case. The judgment was reversed before mainly because of erroneous rulings as to the proper measure of damages. The former appeal is reported in 134 Md. 385.

According to the testimony offered in behalf of appellee, appellant, an incorporated firm of investment brokers, agreed to "undertake to make the issue of the $44,000 or $46,000 seven per cent. preferred stock of the above company (the appellee) within a reasonable time and charge us (appellee) the sum of $5,000 cash for so doing."

The above quotation is from the evidence of Jenkins, the president of appellee, as to the contents of a letter from him to appellant, written the day after the oral agreement was reached, and which Jenkins says Mr. J. W. Middendorf, the officer of the appellant company with whom the negotiations were had, admitted embodied the terms of the oral agreement. Middendorf, in addition to his charge of $5,000 for disposing of this issue of stock, required certain other things to be done. "He said he would require two directors to be placed upon the board of his nomination, that he required me to assign a large number of the patents and patent applications which I had to the reorganized corporation, that he would require me to serve the corporation for quite a period of time * * * Mr. Middendorf said that certain changes would have to be made in the by-laws and charter of the corporation, and that he would wish to approve such changes; these changes included the increased directorate and the larger

issue of stock for his financial purposes. * * * Mr. Midden-
dorf said that he could sell this stock. He said that he had
an opportunity just then between other operations, and he
urged me to complete the change in the constitution and
charter, because it was a very opportune time for it. Mid-
dendorf expressed no doubt at all about selling the stock.
* * * In fact, his concluding statement after saying he would
make the offer to sell it was, 'Oh, I can sell this very easily.' "
Witness accepted this offer first orally and then confirmed it
by letter on or about May 15th, 1914. Messrs. Whitelock,
Deming & Kemp acted as attorneys for both parties, and all
the things required by Middendorf were done, and approved
by him. Afterwards, about the middle of June, witness
called to see Middendorf, who told him that he had received
a report from Mr. Page, the accountant employed by appel-
lant, and that the report was unsatisfactory to him. It ap-
pears that appellee at the beginning of negotiations submitted
to appellant a statement of its condition as made out by Max
Teichmann & Co., accountants. Jenkins testified that there
was no substantial difference in the figures of the two re-
ports, but that Page's unfavorable report was based on erro-
neous conclusions drawn by him not justified by the figures,
and further, that certain figures used by Page in making up
his report were erroneous. A number of attempts were made
to induce Middendorf to investigate this matter, but he failed
to meet appointments after making them. Middendorf said
he was very busy on a large undertaking that had come from
the south and could not be bothered with this small matter,
and asked Jenkins to lay it aside for the present.

On July 15th, 1914, appellee wrote Middendorf as follows:

"Baltimore, July 15th, 1914.
"Mr. J. W. Middendorf,
    "Care of Messrs. Middendorf, Williams & Co.,
        "Munsey Building, City.
"Dear Sir:
    "Referring to the matter of the issue of our pre-
ferred stock, I wish to thank you for the very kindly

interest you have taken in this matter, and also wish to assure you that I thoroughly understand the position in which you are placed at this time owing to general market conditions. It is my desire, however, to wait until you think the time is propitious to make the right effort.

"It has occurred to me that in the interim it is possible that we might be able to place a little stock through some of our friends or customers who are familiar with our apparatus and our methods of doing business. I presume that should we be able to do anything of this kind that it would not interfere with your arrangements and that you would have no objection to our so doing.

"Yours very truly,
"The Alexander Milburn Company,
"A. F. Jenkins, President."

And Middendorf replied as follows on July 21st, 1914:

"July 21st, 1914.

"A. F. Jenkins, Esq., President,
"The Alexander Milburn Company,
"1420 W. Baltimore St., City.

"Dear Sir:

"I have before me your favor of the 15th inst., contents of which has been noted.

"Aside from the general market conditions, you remember, of course, that the report of the operations of your company as made by Mr. Howard P. Page, did not verify the statement of operations put before us at the outset, as I had hoped, which will make it necessary when business conditions improve to deal with the proposition on a different basis.

"I feel that you have a splendid opening, and that it should prove attractive to the individuals who we propose to invite to participate. Meanwhile, if you can place a little stock through some of your friends or customers, who are familiar with your apparatus

and mode of doing business, I would have no objection.

> "Very truly yours,
>
> "J. Wm. Middendorf."

There the matter appears to have rested until March 25, 1915, when appellee wrote appellant referring to its undertaking to sell the stock, and to the expense and trouble appellee had been at in complying with appellant's requirements; also to Page's erroneous report and requesting appellant to "give the matter of your undertaking and the correction of Mr. Page's report the serious attention which it rightly deserves and advise us what you propose to do." The letter further said:

> "As the report of Mr. Page is not only incorrect but harmful, and we have sufficient reason to know both from your own statements and other causes that it has harmed us, we cannot under any circumstances allow the matter to remain unsettled."

The receipt of which letter appellant acknowledged on March 29th, 1915, and said:

> "In reply I beg to state that the matter in question does not interest us at this time."

In the meantime, acting apparently in accordance with the suggestion contained in its letter of July 15th, 1914, assented to by appellant in Middendorf's letter of July 21, 1914, appellee entered upon an advertising campaign as a result of which it sold 588 shares of preferred stock par value ten dollars. In 1916 appellee went to a number of stock brokers and endeavored to make arrangements for raising the balance of the $46,000, but did not succeed in reaching a satisfactory agreement until July, 1916, when the Industrial Corporation of Baltimore undertook to sell appellee's six per cent. notes convertible into the seven per cent. preferred stock. The commission paid was six per cent., and a bonus of fifteen per cent. in preferred stock was given to subscribers and an additional one per cent. was paid for notes sold by outside

brokers.   Besides there was an office fee of $250 paid the
Industrial Corporation and there was an expense of $73.60
for cost of circulars.   There were sold $40,000 of notes.   So
that the items in the bill of particulars for the costs of rais-
ing this $40,000 were as follows:

| | |
|---|---:|
| Bonus in 7% preferred stock | $6,000.00 |
| 5% commissions, cash | 2,000.00 |
| Cost of circulars | 73.60 |
| 1% commissions | 75.40 |
| Industrial Corporation fee | 250.00 |
| There were other items in the bill of particulars for expenses of selling the 588 shares of preferred stock, amounting in all to | 976.02 |
| | $9,375.02 |

Other items were charged in the bill of particu-
lars, but were eliminated by instructions of the trial
court.

There was credited the amount to which appel-
lant would have been entitled if it had performed
its contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,000.00

Leaving a balance of . . . . . . . . . . . . . . . . . . . . . . .$4,375.02

The verdict of the jury was for this balance plus two and
one-half years' interest, or $5,031.27.

There are two preliminary questions to be disposed of be-
fore taking up the bills of exception:

(1) A motion was filed to dismiss the appeal because the
draft of the proposed bills of exception was not submitted by
appellant or its attorneys to the appellee or its attorneys
within the time required by law; and because the bills of
exception were improperly signed by the court below over the
protest of the attorneys for the appellee.

The motion is based on Chapter 625 of the Laws of 1916,
amending Section 316 of the Revised Charter of Baltimore
City, which provides:

"Bills of exception may be signed in any cause pending in any of said courts at any time within the period that the parties, or any of them, shall have the right to file an appeal from the rendition of the verdict by the jury on the findings of the court upon the issue of fact in said cause, and upon filing the order for such an appeal, the time for signing said bills of exceptions shall thereby be further extended until ten days before the period within which it is required that the record shall be transmitted to the Court of Appeals; *provided that the party appealing, or his counsel, shall submit the bills of exceptions to the appellee, or his counsel, not less than thirty days prior to the time that the record must be filed in the Court of Appeals, for the purpose of amendments or additions to the said bills of exceptions,* and the appellee, or his counsel, within fifteen days after the bills of exceptions shall have been submitted to him, shall return said bills of exceptions to the appellant or his counsel, with such amendments or additions as he may desire. And upon his failure to return said bills of exceptions within said time, the bills of exceptions shall be signed by the court, as originally prepared by the appellant, or his counsel. If the said appellee, or his counsel, shall return the said bills of exceptions to the appellant, or his counsel, with his amendments or additions, as hereinabove provided, the said bills of exceptions with such amendments or additions shall forthwith be presented to the judge before whom the said case was tried, who shall settle the same within five days thereafter."

The submission of bills of exceptions to attorneys for appellee was not within the time provided by the statute, but, nevertheless, they were signed by the court before the expiration of the time limited by the statute, and it does not appear that the appellee has suffered any injury thereby.

Under the authority of *Wegefarth* v. *Weissner,* 132 Md. 595, the motion to dismiss is overruled.

(2) After this case was remanded for a new trial an amended bill of particulars was filed, whereupon a plea of limitations was filed as follows:

"That the alleged cause of action set forth in the plaintiff's amended bill of particulars did not accrue within three years prior to the filing of said amended bill of particulars."

To this plea a demurrer was filed by plaintiff and sustained by the trial court. We find no error in this ruling. The action was begun July 2nd, 1915, and the second amended seventh count of the declaration was filed December 4th, 1916. It is conceded that at that time the plea of limitations was not available. When the amended bill of particulars was filed on January 9th, 1920, no further charge was made in the declaration. The cause of action remained the same. The bill of particulars was amended only for the purpose of permitting proof of damages of a different character but resulting from the same breach and recoverable under the same form of action. In such a case the amendment does not let in the plea, if it were not available at the time of bringing the suit. 1 *Poe Pl. & Pr.,* Sec. 619; 2 *Poe Pl. & Pr.,* Sec. 189; *Zier* v. *Chesapeake Beach Railway Co.,* 98 Md. 35; *Strasbaugh* v. *Sanitary Can Co.,* 127 Md. 632. The cases cited by appellant in support of its plea are not in conflict with the view we have taken.

We now come to the bills of exception, of which there are twenty-eight. Of these twenty-six relate to rulings on evidence, one to the prayers, and one to an alleged remark made by counsel in argument to the jury.

And first as to the prayers, the ruling on which is the subject of the 27th bill of exception.

The *Reporter* will set out appellee's 2nd prayer and all of appellant's except the 1st, 2nd, 3rd, 4th, 5th and 6th.

The 2nd prayer of appellee and the 1st, 2nd, 3rd, 4th, 5th, 6th, and 12th prayers of appellant were granted, and

appellant's 14th prayer was granted as modified, the others were refused, and the usual exceptions taken.

Plaintiff's 2nd prayer correctly states the rule as to interest, and the prayer was properly granted. Defendant's 7th prayer asks the court to strike out the several items in the bill of particulars relating to the costs incurred by appellee in disposing of 588 shares of preferred stock amounting to $976.02. It should have been granted and the refusal to grant it was prejudicial error. It is perfectly clear that these costs could not have been charged to appellant if it had performed its part of the contract; and that is the proper test, as the advertising campaign had begun and was well advanced before the abandonment of the contract by appellant by its letter of March 29th, 1915; and, according to the contention of appellee, was authorized by Middendorf's letter of July 21st, 1914.

Defendant's 8th, 9th and 10th prayers ask the court to strike out the several items relating to the costs and fees paid by appellee to the Industrial Corporation for disposing of the $40,000 of appellee's convertible notes. These prayers were properly refused.

On the former appeal (134 Md. at p. 395) this Court gave the following rule for the measure of damages: "It being shown that there was a breach of the contract by the dedefendant and the plaintiff was compelled to go elsewhere for assistance in raising the money required by it, it was its duty to make all reasonable efforts to minimize the loss it had sustained, if any, by reason of such breach and to find another who would sell the stock or raise the money on terms equally as advantageous as those contained in the alleged agreement with the defendant. If, however, after making such efforts the plaintiff was compelled to pay more for obtaining said money or selling said stock than it would have cost it had the defendant company complied with its alleged agreement, then in such case the true measure of damages would be the difference between what it actually cost it to secure the money or

sell the stock and what it would have cost it had the defendant performed its part of the alleged agreement."

There was evidence that appellee conferred with a number of brokers and could not make advantageous arrangements; that the Industrial Corporation is not primarily a money-making concern, but, in a measure, a civic institution. Whether appellee fully discharged its duties in making the most advantageous terms possible, and whether it waited an unreasonable time, or longer than was necessary, were questions of fact for the jury. It certainly cannot be said as a matter of law that the plan under which the financing was to be done should have been exactly the same as that which had been proposed by appellant. The important consideration was to raise the money with the least possible cost, and not the plans by which it should be done.

Appellant's 11th prayer was properly rejected, as it sought to impose upon the appellee the duty of proving what it would have cost to secure the money desired by the plaintiff corporation at the exact time of the alleged breach by the defendant. It might well be that just at that time it could not have been procured at any price. Besides, there was evidence from which the jury could have inferred that the cost was at most no greater at the time arrangements were made than they would have been just at the time of the breach.

We find no error in the rejection of appellant's 13th, 14th, 15th, 16th, 17th, 18th and 19th prayers. The 13th asserts the proposition that a party to a contract to sell stock may avoid such contract on his mere individual opinion after investigation that he could not honestly recommend said stock to his clients. Of course, the correctness of such opinion, however honest it may be, must be decided by the jury, even if it be granted, which it is not necessary here to decide, that one could refuse to carry out a contract to sell stock, not fraudulent, simply because it was not of the high character, from an investment point of view, he could recommend to the class of people who looked to him for advice. Of course,

as an honest man he must be guided by his own sense of right, but it does not follow that his failure to make proper investigation before entering into the contract might not require him to be honest at some personal cost.

The court's modification of the 14th prayer unquestionably corrected the error in the prayer as originally drawn of arbitrarily limiting the time during which appellant's duty continued.

We are unable to say there was no evidence tending to show that appellant could not have sold the stock at the time of the alleged breach, and, therefore, find no error in the rejection of the 15th prayer. Besides, there was nearly a year after the contract was made before the definite breach occurred.

The 16th prayer was defective in that it asserts a proposition which would deprive one of the right to exercise any choice, based upon personal confidence, in the selection of a broker. A broker might be "responsible" without being efficient, honest or loyal. Besides the proper requirement is that reasonable diligence shall be used to secure the money at the least expense and on the most advantageous terms; and not that a man must as a matter of law disclose his affairs and entrust his interests to every supposedly "responsible" broker within reach. The standard is the lowest current or prevailing price and not the lowest cut-rate price.

The 17th prayer is obviously incorrect in that it ignores the testimony of Jenkins that the agreement to give Tinsley $3,000 of common stock was by Jenkins personally and not by appellee, and that it was not a part of the consideration for the agreement of appellant.

The vice of the 18th prayer is that it places undue emphasis on the duty of appellee to procure the money if possible by the Middendorf plan and tacitly assumes that to be the cheapest plan.

There is evidence legally sufficient to establish the contract set out in the declaration, and this disposes of the 19th and last prayer.

We come now to exceptions to rulings on evidence.

The first five bills of exceptions relate to objections by appellant to questions asked in reference to the advertising campaign. What we have said in considering defendant's 7th prayer applies here. The objections should have been sustained. What we have said in reference to defendant's 8th, 9th, 10th and 11th prayers applies to the rulings on the 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 14th and 20th objections. They were properly overruled.

The 15th, 16th, 17th, 18th and 19th bills of exceptions relate to the question of the value of appellee's stock in 1916, 1917 and 1918. This stock was used in part to pay the expenses of financing, and it was, therefore, relevant to show its value, at least in 1916 and 1917; and even if irrelevant as to 1918, there was no prejudicial error in admitting it.

There was no prejudicial error in the ruling in the 21st bill of exception. The witness had already testified to substantially the same thing when giving the contents of the letter which he said embodied the oral agreement. The questions asked witness Pusey in the 22nd, 23d, 24th and 25th bills of exceptions were properly allowed. It was relevant to prove the current rate charged by investment brokers; the weight of the testimony was for the jury.

The objection in the 26th bill of exception to the introduction of the Teichman Report No. 2 was properly overruled.

The 28th bill of exception relates to certain statements made by counsel for the plaintiff in his closing argument to the jury. He is alleged to have said "Mr. Middendorf is as much a speculator as any broker in town." There is evidence in the case as to some of the business schemes promoted by Mr. Middendorf, and it is not for the court to say how far they were of a speculative character. Besides, it is impossible for us to take the sentence quoted, separated from the rest of the argument, and say whether it was or not permissible in the wide liberty in argument necessarily allowed counsel.

The only remaining question to be disposed of is the effect of the erroneous rulings of the trial court on the defendant's 7th prayer and on the evidence objected to in the first five bills of exceptions.

Before the Act of 1914, Ch. 149 (Code, Art. 5, Sec. 22-A), these errors would have made necessary both a reversal and a remand for a new trial of the entire case. *Frank* v. *Morrison,* 55 Md. 409; *Noel Construction Co.* v. *Armorel Construction Co.,* 120 Md. at p. 256.

The article referred to is as follows: "If it appears to the Court of Appeals that a reversible error affects a severable item or part only of the matters in controversy, the Court may direct final judgment as to the remaining parts or items thereof, and may direct a new trial as to the said severable part or item only." See *Bucher* v. *Federal B. B. Club,* 130 Md. at p. 644.

It would seem to be clearly within the spirit and intent of the act to reverse without a new trial as to the severable item, if in the opinion of this Court there could be no recovery on such item.

In the present case it is apparent that the verdict of the jury on which judgment was entered included the items embraced in defendant's 7th prayer with interest for two and a half years, said items with interest amounting to $1,122.40.

It is also clear, in the view we take, that there could be no recovery as to these items, and that it would be futile to send the case back for a new trial as to them.

The judgment will, therefore, be reversed as to the sum of $1,122.40 without a new trial, and as to the remaining amount of the judgment, $3,908.87, it will be affirmed and directed to be finally entered.

> *Judgment affirmed in part and reversed in part, each side to pay half the costs.*